Good morning. May it please the court, on behalf of appellants, my name is Brooke Burson and with me at council table is Suzanne Bostrom. I'm going to try to reserve about six minutes of my time for rebuttal this morning. First I'll talk about why EPA's approval should be vacated and then I'll address why tech standing arguments should be rejected. The approval should be vacated because EPA lacked necessary information about the long-term impacts of TDS on Arctic independent determination that the criterion would protect spawning and without information on the long-term impacts, EPA could not reasonably make that conclusion. I found a brief somewhat confusing on the following. It's your complaint about the long-term impacts of the of the presence of TDS at the time of fertilization or about long-term impacts meaning the presence of TDS over a longer period, I mean either several days or before they hatch or something like that. The former, mainly. Well mainly or only? The former. The reason that the latter, those kind of long-term impacts at other stages, is important is because when when deciding whether or not to approve the 1500 standard, if there's say 25% impacts from that 1500 level at the other stages and there's 50% impacts of that 500 level on spawning combined, you have a considerable impact and that's I think the confusion is that's what we refer to in our briefs as kind of the compound impacts. But mainly our argument here is that without... But if you're not complaining about the presence of the TDS later than the fertilization period then I don't see what the relevance of the rest of it is. Well it's relevant to knowing what the cumulative impact of TDS exposure at fertilization is to Arctic reeling population overall. And I'm not sure that I explained that correctly. But let me, so maybe a way to explain this is that there are... But then if you, I mean I tried to read these reports by Stoeckl, is that his name? I have that. And he, it seemed to me the net impact of what he was saying was that even on these other species, the presence during the fertilization wasn't, he wasn't seeing later effects on it. I think that's actually incorrect and I can directly... We'll be helping to actually go through it. But why don't you go and do whatever you want and get to that. No I will absolutely turn to the Stoeckl report. So Stoeckl was clear that TDS had impacts at both short-term, which is fertilization success, the question of whether or not eggs fertilize when they're exposed to TDS. And also long-term impacts from TDS exposure, meaning of those eggs that are exposed to TDS during spawning, do those eggs that are fertilized actually survive or do they die? So that, the do they die question is the long-term impacts. And Stoeckl observed both. And I would direct the court to page 303 of the excerpt. It's in the third volume. In there, Stoeckl is discussing the short-term tests that have that grow-out period to answer the question of whether or not these eggs die. And he states, and I'm slightly paraphrasing here, but he states that he found significant effects on the long-term survival... You mentioned the health social quotients. Okay, he, and this is the quote, found significant effects on the long-term survival of embryos exposed at fertilization to this TDS mixture. Embryos that survived exposure at fertilization to the highest exposure concentration experienced 100%. Yeah, but the highest exposure concentration was way over what we're talking about. Right, and the problem, the reason that the impact is the important point and not the concentration, is that both Stoeckl and EPA concluded that they couldn't extrapolate those concentration levels to determine when there would be impacts of grayling. What EPA said, and Stoeckl echoed this, and this is, I would direct the court to, pardon, that's page... Stoeckl's conclusion about not extrapolating is on page 354 in that same third volume. And EPA's is in 103 and as well as 210. So by saying that they couldn't extrapolate... Just give us a bunch of numbers. Pardon. I was still trying to find 354. Okay. And then you gave me two more numbers. Yeah, two, so EPA... Remember what they were. Pardon. What are those other two numbers? EPA's conclusion at 354 is where it says, pardon, Stoeckl's conclusion is at 354, where he says you can't extrapolate these results to other species. And EPA also said, importantly, and that's at page 103 of the excerpt, as well as 210, EPA said... Well, yes, but ultimately, we understand that, but there is nothing in his study that suggests that at the concentration level that we're talking about, that any of the species that he did look at had a long-term problem from simply fertilization exposure. Is that true? The coho, where there were fertilization exposure, true at the 1500. The coho showed impacts at 1875 and I believe 2000. So why wasn't the EPA entitled to say, you know, not only is there a extrapolation to species problem, but there's an... but even for no species was this problem shown. I mean, what I found confusing, as I said, was that you seem to push, leap over to the question of his other studies where he did longer-term exposures, but in the studies where he just did this short-term exposure, there didn't seem to be any basis for concern at this level. Well, I think the reason why I... the point I'd like to make regarding the EPA, and which is based on Steckel's conclusion about extrapolating, means that it's not the concentration level that that matters, it's the impact that matters. And so the Steckel study's results about long-term impacts is what is important here. So when we're talking about... On the two connected. Pardon? Concentration levels and impacts. For individual species, of course, but for making a reasonable determination, which is what EPA had to do here, that the criterion would protect grayling spawning, because EPA concluded that they couldn't extrapolate the results, and because the Steckel study showed that there were these long-term impacts, the effect... So... I'm sorry, I'm confused. I thought the Steckel study looked at short-term impacts, except for the 99 study that he couldn't replicate. And then the EPA said, okay, go... TEC has to go and do studies on short-term impacts on the grayling specifically. But, you know, looking at the page you had cited us to, right above the part you put, it says, the assay does not yield any information about the possibility of long-term or delayed effects. Yes. So Steckel didn't see, other than the 99 study that you cited in your briefs, I guess I just didn't see... So let me back up just a second to take a moment to explain how he organized his studies. He actually did three tests. He did two tests, what he terms acute tests, and those are ones that had short-term exposures. One had a short-term exposure, but then a grow-out period to test those delayed impacts. And then there was another acute exposure test, where there was just a very short-term exposure, and then he killed the eggs. And that was just the, do the eggs fertilize or not question. And then there was a third set of studies, which he deems the chronic impacts. And there, that's where he exposed the eggs and the fish at various concentrations for longer periods of time, and then actually let them grow out as well. And one of those chronic studies was also just a fertilization exposure study. And one of the shorter term, with the grow-out period, was a fertilization exposure study. And those two tests did show that there were long-term impacts. And the study that had that grow-out period. And that's why his conclusion there, about that study having long-term impacts, is very important. It didn't have long-term. He said, he said affects the long-term survival. So that's embryos, which is different. So survival of embryos is different than the long-term effects on the fish, right? No, because the question here is whether or not that the two impacts from exposure at spawning, the short-term, which is whether or not the eggs fertilize, and then the long-term, which is whether or not those embryos, those fertilized eggs, die. So when he's saying long-term impacts there, what he's referring to is egg mortality. And because he concluded, based on his, both his acute tests with that grow-out period, as well as his chronic tests that looked at fertilization. The EPA obviously looked at the stackle and drew its conclusions. I'm having trouble understanding where you think they were unreasonable. I mean, there are various things you can draw from the reports and various inferences, but it seems to me that they looked carefully at the report and drew inferences, and I can't see where they're unreasonable. And I think this goes to... Or capricious or arbitrary, whatever the standard is. Right, arbitrary, capricious, and I... They had to be drunk or crazy to... You know, it's wholly unreasonable. It seems perfectly workmanlike product based on a report. It's pretty thorough. Where is the unreasonableness? Well, the unreasonableness is that Steckel concluded that there were these impacts to egg mortality. And EPA disregarded those, actually never provided an explanation as to why it was interpreting, in the record, never provided an explanation as to why it was interpreting those results. So that it didn't need to focus on those, that egg mortality question, that it could only focus on the egg fertilization question. So just to get back, one follow-up question. I thought the 99 tests was the one that said there were rates, high rates of long-term mortality, but the 2000 test didn't replicate the result. Am I wrong on that? I believe, as a factual result, that is correct. But the point there is that Steckel, when he's describing overall his conclusions for the report, and his conclusions about the impacts of TDS, what he says, and this is at page 354 of the excerpt, he says that the most notable effects that we saw were related to mortality rates. Higher TDS concentrations at fertilization were related to higher pre-hatch mortality rates. So it is true that one test didn't show that, but collectively, when he looked at all of the information in his report and was drawing his conclusions... Why was it unreasonable for them to just say, we don't share his conclusions, but look at his data, and we draw our own conclusions? Why are their conclusions unreasonable? Well, they didn't actually ever say... EPA never actually said, here's the conclusions we're drawing from Steckel's long-term data. What they said was, in 2003, they actually looked at that long-term data, and they said, Steckel shows that there may be these adverse impacts on the egg survival, and then turned around and kind of put the blinders on and never explained why it was interpreting the data. That way, to allow it to ignore those long-term impacts. You've got seven minutes left. Do you want to save time for rebuttal? Do you want to address standing issues? I'll very briefly address standing. I'm going to focus my comments on injury, and I'll primarily just talk about Point Hope right now. First, the government concedes that Point Hope has standing. Only Tech is challenging standing and is in many ways arguing that they need to show actual environmental harm, and is also trying to create ambiguity in the declarations where there is none. Point Hope has standing based on tribal member use of grayling for subsistence and for cultural food sharing. Franklin Sage states that he eats fish and participates in a cultural trade for fish, and that he removes the outer layer of fat to protect himself from health concerns. His interest in fish and his use of his fish is impacted by the approval. Specifically, he says, I and my, when he's referring to trading fish for other foods, which means logically he eats the fish. It's also clear that he's referring to grayling here, because he says what species of fish people get from the Woolock River, and so his later descriptions of using those fish from the Woolock River necessarily include grayling. Jack Schaefer also talks about a cultural food exchange. The TDS doesn't make the fish toxic, does it? I didn't quite understand this removing the fat and stuff. There's the perception that the pollution in the river, which includes TDS, makes the fish unhealthy to eat. So they don't need to show that TDS actually makes the fish toxic. It's that they've altered their practice. So how was the EPA changing the 1500 to 500 during the spawning period? How would that redress his problem? On readjustability, that would ensure that there are fish available for subsistence. So that has nothing to do with his perception, or his cutting the fat off, or anything else, right? The TDS specific, no. Because the challenge, we're looking at his standing to address the challenged decision by the EPA. I was having real trouble finding the connection between the challenged decision and anything that he stated in his declaration. I mean, there was no evidence that anything that happened up in the Red Dog Creek, or whatever it was, was going to affect the number of grayling that he was getting. So I was having trouble seeing that connection. That's tied to the merits, is that if TDS is less protective, he's going to have fewer fish available. What's the evidence for that in the record? His statement in Mr. Sage's declaration there is at paragraph 12 on page 36. So are all grayling in the area that people fish where he is, are all those grayling from the Red Dog Creek? That's the only source of supply? No, I believe that some spawn in, and I don't know how to pronounce the name of the creek, Iqalocloc. But we cite cases in our brief where the fact that it's a migratory species, or that you may use some fish is not dispositive of the issue of addressability. Unless there are further questions, I'd like to reserve the remaining time for rebuttal. Thank you. Thank you. Okay, we'll hear from our colleagues. Good morning, Your Honors. Nicholas Demasio on behalf of the United States EPA, and may it please the Court. I'll be using 15 minutes of our response time this morning, and counsel for interveners will be using five. Your Honors are correct that the appellant's point of hope raised one very narrow challenge to EPA's decision, in this case in their opening brief, and that was that EPA had to obtain additional information regarding the delayed effects of exposure to total dissolved solids at fertilization specifically before it could approve the standard here. Where in the record is EPA's explanation for why it did what it did? Well, the specific approval of the – It says 2006 approval, but it didn't say very much. Is that the one? That's one place where EPA explains its reasoning. Another place where EPA explains its reasoning is an excerpt of record 100. That's the EPA approval where they specifically state what the clear finding of the Stekhol study was, and that was an impact on fertilization success, meaning a decrease in fertilization rates with increasing concentrations of total dissolved solids exposure. Okay, but is there anywhere where the EPA explains why it didn't concern itself with later impacts on fertilization? I think that not explicitly, Your Honor, but the places where I would direct you to look are EPA's discussion of the Stekhol study at excerpt of record 100, where they specifically state what they find to be the clear finding of that study, and excerpt of record 216, where they, again, discuss what Stekhol's results had shown. And in both places, EPA consistently states that the clear finding of the Stekhol study had to do with fertilization rates. And it's important to remember here, Your Honor, that under the EPA standard of review, an agency doesn't have to explain every scientific uncertainty in its decision. What it needs to do is state a rational connection between the facts that it's found and the choice that it's made. And here, it was reasonable for EPA to concentrate on the clear finding of the Stekhol study with respect to fertilization rates when it conducted a follow-up study that showed no significant impact to fertilization rates. And where does, in the technical justification letter or the other, does it say that the concern was with fertilization rate as opposed to TDS of fertilization? The term fertilization success that EPA uses at excerpt of record 100 is meant to refer to that finding that Stekhol stated, that increasing concentrations of total dissolved solids at fertilization led to decreasing fertilization rates. And the way that we know this is if you look at excerpt of record 216, where they discuss the study, he specifically recites the concentrations at which there was a significant effect shown on fertilization rates. So consistently throughout the record, there's the use of this term fertilization success. And what EPA shows through its discussion is that it's referring there to his finding on fertilization rates. So the point here, Your Honor, is that where EPA has... EPA scientists have reviewed the study, provided what they found to be the clear effect of that study, performed a follow-up study, and found no significant effect to fertilization rates at total dissolved solid concentrations, almost double that allowed by Alaska's criterion, it was reasonable for EPA to conclude that no further inquiry into this unsubstantiated effect on later mortalities was warranted. That was certainly a rational mode of decision-making, and therefore under the EPA standard of review, it should be upheld. I'd just like to respond very briefly to Point Hope's assertion about the Steckle statement on excerpt of record 303, about the significant effects on long-term mortalities. And I think when you look at this record, when you take that statement in context, that is a statement that Steckle is making in the discussion section of his report. And it directly conflicts with statements that he made in the data analysis section of his report, where he specifically states that his only statistically significant effect was reduced rates of fertilization with increasing concentrations of total dissolved solids exposure. That's at excerpt of record 271. He also was not able to replicate this trend that he's kind of speculating about in his discussion section. He saw that only in one of his tests, his acute test. That's the Brood Year 99 test. He was not able to replicate that result in the Brood Year 2000 test. And you can see that most clearly. Could you go back and show me where you are? I'm on ER 271, and you said that he said that the only statistically significant conclusion was with regard to fertilization itself. Yeah, so at the end of his abstract here, he says, only reduced rates of fertilization with increasing concentration of total dissolved solids were significant. He's referring there to his data analysis section, which is on 275 to 276, where he discusses the results from his two acute studies in Brood Year 99 and Brood Year 2000. And if you look at the discussion on 275 and 276, he makes it very clear that his statistically significant effect here, he says most of the effect was from lack of fertilization. He did not find an independent statistically significant effect on long-term or short-term mortalities in Brood Year 99. He said what he's doing is he's characterizing certain trends that he thinks he may see. And how I would urge your honors to interpret this statement in the discussion section that they're pointing to, is this is simply Steckel speculating about the results of one of his tests in order to warn about the limitations of his study, not to state a scientifically defensible conclusion. And if you compare the charts on page 279, you see these graphs of his results, you see this consistent effect that he's showing in other salmonids regarding lack of fertilization, and that's consistent between the two year studies. But if you look at the mortality effects, he simply does not show anything whatsoever with respect to long-term. So where are the mortality effects? At the top of the two top charts. Top of which page are we looking at? On page 279 and 282, you see that there's a flat graph for both short-term and long-term mortality. That's true on 279. That's why I find this very hard to understand. Yes, on 278. On 279, it's not a flat graph. Correct. And what he's saying here, back when I'm referring to page 271, is that only reduced rates of fertilization with increasing concentrations were significant. So these effects that you're seeing in the 279 graphs, he's specifically stating these are not statistically significant. These are just trends that he's characterizing in his data, but the statistically significant effect was on percent unfertilized in both 279 and 282. So, you know, Steckel then later in his subsequent study goes on to interpret his study just as EPA did to have shown that exposure to total dissolved solids at fertilization impacted fertilization success, and he recommended use of this short-term fertilization test, which is precisely the type of test that EPA followed up with. And the core of our position here is that when the results of that follow-up study showed no significant effect on fertilization rates at total dissolved solid concentrations, almost two times higher than what Alaska had shown, there was no burden on EPA. They could reasonably conclude that follow-up study into this. How does this scheme work now? It's now seven years later. Presumably if somebody wanted to know something about what's actually happened, you could find out. Is there anything that triggers the need to revisit this? There is a triennial review that is in the EPA's regulations where the state will go back and review its water quality criteria. And so, yes, there is an opportunity for EPA, for the state to look at new developments in science and if those developments in science show that for whatever reason there's now some indication of problems, then they would be able to review that and adjust their criterion accordingly. So it's not as if this criterion is set for all time. If there was just an observed decrease of these fish in the area, would somebody know that? Absolutely someone would know that, Your Honor. I mean, this is a very highly monitored creek. The state Fish and Wildlife folks are out there and waiters, you know, doing field surveys of the fish on a fairly regular basis, and a lot of that information was reviewed by the state in making these determinations. EPA's most recent comment on this issue is that it appears in recent years that Arctic grayling's use of Red Dog Creek is increasing. It doesn't know what to attribute that increase to or whether or not it will continue, but certainly at this point— It may have been chased away from other places. Your Honors, unless there's any further questions— Thank you. Thank you. We'll hear from the intervenors. Good morning, Your Honors. My name is Jeff Leppo. I represent NANA, the Alaska Native Regional Corporation that owns the land and resources of Red Dog Mine as well as the bed and banks of Red Dog Creek. I'll be addressing standing on behalf of NANA and Tech Alaska, and unless you direct otherwise through your questions, I'll focus in my limited time on plaintiff Point Hope and on injury in fact. We all have limited time. Yes, we do, Your Honor. So we probably should just get to the point. Okay. To demonstrate injury in fact, at least one of Point Hope's declarants must demonstrate two things, both use of the resource, in this case arctic grayling that spawned in main stem Red Dog Creek, and curtailment or diminishment of some other specific injury, some other specific injury— So we have a member who says he eats fish. Yes. What else do you mean? Well, Your Honor, fish is the epitome of not being concrete in particular— Well, he mentions he eats fish. I mean, that really is a fairly nitpicky— I mean, he says there are these different fish, and I eat fish. Well, Your Honor, that's actually—the point is you do have to be concrete and particularized. This was an easy test— See, I'm not picky. You know, I fish what comes out of the water, and, you know, there are fewer fish in the water, or there are fish in the water that are contaminated. That spoils my enjoyment of the fish. He doesn't say it spoils his enjoyment of the fish, Your Honor. There are two parts to the test. The first part is he must use the resource, and I submit, Your Honor, that there are 30,000 species of fish, and to say I use fish is not particularizing concrete in the way that the Supreme Court has applied it. It's an easy test here to know exactly what species of fish and exactly from what stream we're talking about because this is a very narrow case. It was not—this is not a question of— I don't fish, so I don't know these things, but I thought what you did is you sort of throw a line in the water and then whatever is down there snaps it up, and then you pull it up, and you eat it. I mean, I don't know. Isn't that how it works here? That is how it works, Your Honor. Of course, neither Mr. Sage nor Mr. Schaefer testified of fishing at all in this stream. They testified—Mr. Sage said that he trades regularly for fish, not Arctic grayling. He never even mentions Red Dog Creek, let alone main stem Red Dog Creek in his declaration whatsoever. The clearer point, rather than to debate what fish means, and I nevertheless submit that fish is not concrete and particularized in this context, is that he never speaks to any harm, any actual injury to himself. He never says—he says he trades regularly. He never says he trades less. He doesn't say he enjoys trading less. He doesn't say that he eats less. He doesn't say that in any way, shape, or form his activities have been changed. What he does say, and counsel referred to this, is that people in Kivalina, which is a village 50 miles away from Point Hope, the plaintiff here, people there remove the skin and the outer layer of fat. And as Your Honor pointed out, there's no linkage between that. What he says is somebody unidentified once told them to do this because of pollution, generic pollution, from Red Dog Mine. He does not link it in terms of either temporally or substantively to the adoption of this water quality standard. There's no indication they started doing it because of it or that they would stop doing it if this were to change. And so there's no connection between this removal. In fact, he doesn't say that he eats less fish or that his enjoyment of fish or his trading for fish is in any way diminished because of this practice, which apparently has been going on for quite some time. And so even if Your Honors are inclined to believe that fish is sufficient, there's still no connection to injury here. And that's a requirement. That's the second piece of the injury in fact standing. Well, the injury is that if there are less fish, there will be less fish. And in the environmental cases in general, they haven't required an already existing injury in the sense of an already existing decline, right? Well, no, they haven't. Of course, this is a water quality standard that's been in place for five years when this case was filed and now has been in place for seven years. But in any event, neither Mr. Sage nor Mr. Schaefer are experts, and they didn't testify that this would lead to a decline. They testified that they had a concern. Well, they don't have to testify that it would lead to a decline. Well, they do have to make some connection. In Lujan and every other one of these cases, the concern is that it wasn't looked at properly and there could be a problem as a result of that. Well, the issue, though, Your Honor, is their personal injury, right, not the injury to the environment. So if we're going to focus on whether the environment has changed, that's not the question. The question is, have these plaintiffs suffered some injury? And the concern that he has that there may be fewer fish in the future is not a statement of a concrete and particularized imminent or actual injury, and that is particularly true in the context here where the water quality standard was in effect for five years. Does he have to wait for fish to actually be dying? He said, look, I fish there, all right, and somebody's poisoning the fish, and I'm not going to wait to find dead fish on the water. I think the activity, because it's poisonous, it's in the field of my fishing and drying fish. Isn't that essentially what he's saying? No, what he says, Your Honor, is that he's concerned. And what you see in other cases is... I'd be concerned, too, if I was fishing there and somebody was putting in poison to the fish. I'd be concerned. I understand that, Your Honor, and yet that has to manifest itself in some specific way in a form of injury. He has to stop eating or he has to testify that at least he enjoys eating less or he trades less or his activity has diminished in some way. In Your Honor's case, in the Pacific Lumber case, the individuals there said that they used a specific piece of river and that their enjoyment had been diminished, that they no longer canoed or they no longer fished or they no longer swam, that each of them had taken a particularized step that resulted in an injury to them. Mr. Sage and Mr. Schaefer testified to no such thing. They trade for fish regularly. They still trade for fish regularly. They don't testify to enjoying subsistence or to any other activity less. You've got two and a half minutes of your limited time left. I'm happy to stop at this point unless Your Honor has other questions. Thank you. Okay, thank you. I think you have four minutes on those, about 355. We'll make it four, won't we? Oh, and I hope I don't actually take all of the four minutes, just a few points to make on rebuttal, Your Honors. First, EPA is not entitled to deference here because its decision is arbitrary because EPA's conclusion about the clear findings of STECL is contrary to those findings of STECL itself, and I cited the one statement about the conclusion regarding later impacts. I'm sorry, I didn't hear the question. I cited in my main argument to page 303, and in our briefs we also cite to other pages in the STECL report where he's clear about his conclusions regarding the impacts of exposure, those long-term impacts. And another point regarding there were some questions about where in the record EPA's treatment of the STECL report appears, and that is the crux of the problem, is that there is no treatment of the STECL report's long-term findings. It's essentially a gap in the record. The treatment given by my colleague here today regarding those results is the only explanation we get to justify that, and that's a post-hoc explanation not entitled to deference. But it's kind of odd to have to comment on the absence of something. In other words, if they looked at this report and said this is the significant finding and there isn't another one, then why should they have to talk about the one that isn't there in their view? In their view isn't there. Well, if they were going to interpret STECL one way, contrary to STECL's very consistent conclusions about these long-term impacts, it needed to be on the record. They need to have a reasonable decision based on the record before them, and it needs to be explained. So when they're faced with the reports, the scientific reports, and these are the agency scientists saying here's our conclusions, here's our conclusions about whether or not eggs will die, here's our conclusions about whether or not eggs will fertilize. If they're going to disregard that chunk, whether or not they think it's important, then they need to explain that to have a reasonable decision, and that's where EPA erred here. They didn't explain it, and it looks from the record that they failed to consider an aspect of the problem. I think unless there are further questions, I will. Do you disagree with the understanding of the report that the only statistically significant impact was that one? Yeah, I do as a question of the results, yes. But I also – EPA needed to determine and explain that. I know, but I'd ask you a different question. Do you disagree with that understanding of the report? Yes, because there are portions of – some of Sekul's findings found 75 percent impact on eggs, others found 100, some found 50 percent. So yes, as an interpretation of the results. So what did he mean when he said this was the only significant one? And I believe that that is a statement that he makes on – that's in the abstract, and when you look at his other statements about his conclusions, he states very consistently that there are these later impacts. But he might have – I mean, the explanation given now is, yes, they were descriptively present, but they weren't statistically significant. I think – I guess that's – I interpret that to contradict his other statements about what those impacts are and the percentage of impacts that he observed. So if he contradicts them, why can't the EPA choose, you know, make this judgment and say, you know, there are contradictions here, we go with this? They can, but they need to explain that, and that's what – they didn't explain that here. They – I mean, they explained that here today. They didn't explain that in the record, and that's the problem. And I see that I'm out of time unless there's more questions. Thank you. Cases, however, stand submitted. Well done. All rise.
judges: Kozinski, Berzon, Ikuta